ALLEGANY COUNTY.—HON. CLARENCE A. FARNUM,
SURROGATE.—February, 1888.

MATTER OF INGERSOLL.

*In the matter of the estate of* JOHN INGERSOLL, *deceased.*

An executor or administrator cannot charge for the use of his own horse
and wagon, employed by him in collecting the assets of his decedent's
estate; although his bill for livery expenses, when reasonable in
amount, and necessarily incurred in the administration, will be allowed.
Pullman v. Willets, 4 *Dem.*, 536—followed.

An executor or administrator may, where peculiar circumstances render
such employment suitable, be allowed credit for disbursements repre-
senting moneys paid to an agent employed to collect debts, even
though the debts prove bad.

But where a resident executor voluntarily removed from the State before
completing his administration, and employed an agent to perform the
unfinished business, the performance of which by himself was ren-
dered impossible by his absence,—

*Held,* that the executor must pay out of his own pocket for the services of
the agent, and could not be remunerated, out of the estate, for travel-
ing expenses incurred in returning to the State.

McWhorter v. Benson, *Hopk. Ch.,* 28; Cairns v. Chaubert, 9 *Paige,* 160;
Everts v. Everts, 62 *Barb.,* 577—distinguished.

HEARING of objections to account of Simon C. Ved-
der and Alonzo Sweet, executors of decedent's will,
filed in proceedings for judicial settlement. The facts
appear sufficiently in the opinion.

GEORGE W. HARDING, *for executor, Vedder.*

RICHARDSON & ROBBINS, *for objectors.*

THE SURROGATE.—Upon this accounting, the lega-

tees object to the item of $100 charged by Simon C. Vedder, one of the executors, for the use of the horse and wagon of the executor, claimed by him to have been used in the collection of the assets of the decedent.   An investigation of the claim shows that the executor kept no account of the times when his horse and wagon were used, and when required to make up an itemized or detailed statement of it, declared his inability to do so.   He has been allowed his bill for expenses paid for livery used in the business connected with the administration of the estate, and it now needs no citation of authority for such allowance for the actual disbursements so made by him, necessarily incurred in the management of the estate.

It is quite evident that, until the time when this executor was cited to account, he had no intention of charging for the use of his horse and wagon.   He has made a charge, in gross, of $100 for such use.   If he could be allowed anything, considering the unsatisfactory condition and presentation of his claim, we think the amount claimed far too much.   It has been urged by the executor that, if he had hired a livery for the same purpose for which he used his own horse and wagon, the sum paid would have been allowed him, and that there is no sound reason why he should not receive the same compensation for the use of his own property that he would have been compelled to pay, had he hired from another.

In Collier v. Munn (41 *N. Y.*, 143; s. c., 7 *Abb.*, *N. S.*, 193), it was held that, where an executor who was an attorney had performed legal services which were beneficial to the estate he represented, he could

not be allowed compensation for such services; and again, in Morgan v. Hannas (13 *Abb.*, *N. S.*, 361), the same court denied the right of a mechanic to receive compensation for mechanical labor performed by him upon his ward's property: the reason for such decision, in the two cases above cited, being that a trustee should not be led into temptation to do anything in the administration of his trust for the mere sake of the compensation to accrue thereby.

"No man can faithfully serve two masters whose interests are in conflict" (Story on Agency, § 210). "It is a rule of necessity which the test of experience has rendered inflexible" (Smith v. City of Albany, 61 *N. Y.*, 444, 446). The law prohibits a judge from acting in a case where he is related to one of the parties. It is not left to his discretion, or to his sense of decency, whether he shall act or not. The urgency of a particular case is not to be considered. Partiality and bias are conclusively presumed from the relationship, and it disqualifies the judge. In the relationship of attorney and client, the law not only watches over all the transactions between the parties, but often declares transactions void, which, if the relationship did not exist, would be held proper. It does not so much consider the bearing or hardship in particular cases, as it does the importance of preventing a general public mischief, which may be brought about by means secret and inaccessible to judicial scrutiny; it supersedes the inquiry into the particular means in a given case, a task often difficult, and ill-supported by evidence which can be drawn from any satisfactory sources (1 Story Eq. Jur., §§ 310–312).

So, with the relationship of trustee and *cestui que trust*. A trustee is not permitted to obtain any profit or advantage to himself in the management of his trust: he may not buy for, nor sell to, his *cestui que trust* property in which he has a secret or individual interest. "The law permits no one to act in such inconsistent relationships. It does not stop to inquire whether the contract was fair or unfair. It stops the inquiry when the relationship is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them, as far as may be, impossible, knowing that real motives often elude the most searching inquiry, and it leaves neither judge nor jury the right to determine, upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand or fall" (Munson v. R. R. Co., 103 *N. Y.*, 58, 74; 1 Story Eq. Jur., § 322).

These authorities all deny the right of a trustee to profit by any dealings with his trust: they also deny the validity of an agreement made by him, where he is so placed that he might derive a profit. His interests may be antagonistic to his trust, and experience shows us they often would be. No sound reason exists for giving an executor compensation for the use of his own property, while he would be denied the right of receiving compensation for professional services or the right to be allowed the value of his labor as a mechanic performed for the benefit of his *cestui*

*que trust.* As said by the Surrogate, in Pullman v. Willets (4 *Dem.*, 536), in a similar case, the "executor would be quite likely to have different views of the necessity of making frequent journeys, when he was to be paid for the use of his horse in making them, from what he would if the money for such travel was to be paid to another." There may be cases where the enforcement of such rule will work a hardship with the trustee, but we think that, in the end, more perfect justice will be worked by a strict enforcement of such rule, and we heartily concur in the authority of Pullman v. Willets, and deny the right of the executor to be paid anything for the use of his horse and wagon in the business of settling the testator's estate.

*Second.* The legatees next object to the allowance of $100, paid by the executor to J. P. Manchester for "collecting bad debts." The executor contends that this item was an actual and necessary expense, made in the proper performance of his trust. Should this view prove to be correct, then the payment made was proper. This leads to an examination of the services performed by Manchester. It appears that he was a private banker at Hume; that, in a few instances, he permitted his name to be used as a plaintiff, in actions brought upon claims held by the estate against its debtors. One action was commenced in the Supreme court, where the defendant succeeded and a judgment for costs was rendered against Manchester, which judgment has been paid by the executor together with all of the costs, expenses and disbursements of plaintiff, made and incurred in the action. Three or four judgments were recovered in Justices' courts, in the name of

Manchester, upon claims of the estate against its debt-
ors, none of which have ever been paid, but the costs
incurred by the plaintiff have been fully paid by the
estate.  It does not appear that he ever was present
before the Justice, and it does affirmatively appear
that he was in Alaska when the Supreme court action
was tried.  It does not appear that an hour of his time
was ever taken, in the prosecution or management of
the suits mentioned above ; nor that he has done any-
thing in the management of the matters, but that the
executor could have performed as well.

It is also claimed by the executor that Manchester
collected quite a sum for the estate, upon notes and
accounts owned by the testator at the time of his
death.  An investigation of this claim shows that
this amount was nearly all collected after this execu-
tor had been such for upwards of two years, and had
then removed from this State, with his family, to
Nebraska.  All that need be said upon that point is
that, if the executor saw fit to remove from this State,
before he had settled his trust, and chose to appoint
an agent to perform duties which the law had imposed
upon him, if he be compelled to pay for such service,
it should be from his own pocket and not from the
estate of which he is a trustee.

From an examination of the executor's account as
made by himself it appears that, for nearly four years,
this executor has had under his control, belonging to
this estate, a sum of money of not less than $3,000
which money has been deposited with Manchester, and
which we have the right to assume has been used by
him in his business.  In the spring of 1886, shortly

before the executor Vedder went to Nebraska, his co-executor, who resided in this State remonstrated with Vedder, and insisted he should not leave this State until he had settled his trust, nor should he leave the unfinished business with Manchester, and the executor Vedder then said to his co-executor that Manchester would not charge a cent for his services. It is but fair that the executor shall stand by that promise, and make it good.

The debts of the estate were in all only about $1,700, and the assets collected have been upward of $20,000, so there has been no necessity for this executor to retain in his hands so large a sum. He permitted these moneys to remain with Manchester, and even if the latter had any claim for these trifling services performed for the estate, any sort of prudent care on the part of the executor would have required him to insist that the value of the use of these moneys far exceeded the value of the services, and that he ought not in fairness to present any claim. Had the legatees made claim in proper time, it is quite probable that this executor would have been charged with interest upon at least $3,000, for the period of 18 months.

Their counsel are not negligent in omitting to raise this question promptly, for until about the time of the closing of the executor's examination, and until after they had an opportunity to analyze the account, they could not have ascertained its condition, and could not have known that such a large balance had all this time remained in his hands. The authorities of O'Gara v. Clearkin (58 *N. Y.*, 663); McWhorter v. Benson

(*Hopk. Ch.*, 28); Vanderheyden v. Vanderheyden
(2 *Paige*, 287); Cairns v. Chaubert (9 *Paige*, 160),
and 3 W'ms on Ex'rs, do not warrant the allowance of
this claim.   These cases hold, substantially, that
where, from peculiar circumstances or the peculiar
nature or situation of the property, the services of an
agent are essential in the care or management of the
estate the value of such services may be paid from
the estate.   These elements do not exist in this case.

*Third.* The claim of the executor Vedder of
$118.98 made of the following items:

Car Fare from Nebraska to Hume,   $43.98
Hotel Bill on Journey   .   .   8.00
Board of executor here, from March
    28, 1887, to August 10, 1887   .   67.00

must be disallowed.

At the time the testator's will was made, and until
the spring of 1886, the executor Vedder resided at
Hume, N. Y., the home of the decedent; the executor
Sweet, a son of the decedent, then and ever since has
lived in Madison county, in this State.   Letters testa-
mentary were issued to these executors February 13th,
1884; the executor Vedder has been the acting rep-
resentative of the estate.   For a period of more than
two years prior to the spring of 1886, Vedder had
been engaged in the administration of the estate, and
then, for his own convenience, he moved to Nebraska,
which State ever since has been his home.   Before
moving away, he had ascertained the situation and
condition of the estate, and had converted into money
the bulk of it.   The claims of the decedent were then
substantially all paid.   Shortly before leaving for the

west, the co-executor was at Hume and had a conference with Vedder, and insisted that Vedder should account before he left the State. He declined to do so, and left without having made a settlement, or passing over the remaining assets of the estate to his co-executor, residing here. Vedder had been permitted to manage the estate up to this time for the sake of convenience and economy, he being upon the ground where the debtors of the estate resided, and the other executor residing in a distant part of the State. ——

In the spring of 1887, Vedder came back to Hume from Nebraska. After he had been here about two months, certain of the legatees cited him to show cause why he should not settle his accounts. After some delay, he filed a petition for a judicial and final settlement of his accounts, and from that time the two proceedings have been continued together.

Counsel for the executor Vedder cites the case of Everts v. Everts (62 *Barb.*, 577) as an authority for allowing the claim for car-fare and board upon his journey here. We do not so understand it. The facts of the case are not fully reported, yet we infer that the executor in that case was not a resident of this State when the will in question was made and when letters were granted him. We find (page 578) that, when he was about to depart from the State, his sureties applied to the Surrogate to be relieved from their obligations on account of his future acts or defaults. It seems he had given bonds for the faithful performance of his duties before this step was taken, and as no reason is given for exacting a bond from him, it may be inferred it was on account of

his not residing in the State. This inference is strengthened by reading the opinion of Justice MUL-LIN, at page 581, where he said : " I think the Surrogate properly allowed the expenses of the executor in coming from Iowa when the will was proved. The testator knew that such journey must necessarily be made, and it was necessary to enable him to qualify."

In the case at bar, the testator chose one of his executors who resided in his neighborhood and the other who lived at a distant point in the State. It is highly improbable that he contemplated that his executors would remove from the State before they had closed their trust. They then resided here. More than two years elapsed from the time of their appointment before the executor removed from the State. Had he closed up his trust, within that time there would have been no necessity for a return, so far as this estate is concerned. Or, if the estate was not in a condition so that the accounts of the executors could then be finally settled, an intermediate accounting could have been had, the assets not fully converted into money passed over to the co-executor here, and the executor Vedder discharged from his trust. He elected not to do that, and, to suit his own convenience, left his accounts unsettled. There is no justice in his claim, and I am unable to find any authority warranting its allowance. The case of Elliott v. Lewis (3 *Edw. Ch.*, 40), cited by the counsel for the executor, does not sustain his position. There the VICE CHANCELLOR held that the expenses of the administratrix and her husband, in coming from Washington to New York, to be examined as witnesses in the pending

foreclosure suit, were properly allowed; which decision was placed upon the ground that it was indispensable that they should so come and be examined. That case is clearly distinguishable from this. . . . .

We have above considered all the objections raised, other than those passed upon·during the progress of this contest, so that counsel will have no difficulty in preparing the proper decree to be entered in accordance with the views expressed.